Henry Joehnk, Administrator, Appellee, v. Charles H. F. Smith et al., Receivers, etc., Appellants.

## Gen. No. 5378.

CONTRIBUTORY NEGLIGENCE—*when person passing between cars guilty of. Held,* under the evidence, that the plaintiff's intestate was guilty of contributory negligence in seeking to pass between two freight cars which formed a part of a string of cars which it was sought to couple by being sharply struck by an engine.

Action in case for death caused by alleged wrongful act. Appeal from the Circuit Court of Ogle county; the Hon. OSCAR E. HEARD, Judge, presiding. Heard in this court at the April term, 1910. Reversed. Opinion filed October 18, 1910. Rehearing denied April 6, 1911.

J. B. STEPHENS, for appellants; JOHN BARTON PAYNE, of counsel.

S. C. SCOTT, W. J. EMERSON and C. C. MCMAHON, for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

On the evening of January 9, 1908, near the village of Myrtle, in Ogle county, on the line of the Chicago Great Western Railway, Frederick Hans Otto, assist-

ant train-master, started to go between two freight cars of a wrecked train while the wreck foreman was trying to have the string of cars coupled up by having them struck sharply by an engine. Otto was caught and crushed between the cars and was so severely in-- jured that he died a few hours later. His adminis- trator brought this suit to recover the loss to his next of kin by his death. The first count of the declaration charged that Otto was assistant train master, and that when ordered by defendants, it was his duty to go to any wreck and to care for and dispose of damaged freight and wounded live stock; that this wreck oc- curred at Myrtle, and the receivers ordered him to go to the wreck and care for the merchandise and live stock, and that he obeyed said orders and, while caring for said merchandise and live stock, other servants of defendants, not fellow servants of Otto, were placing derailed cars back upon the rails and there was an opening of three feet between two of said cars, which defendants had left for Otto to use as a passage in going back and forth across the track in caring for and disposing of said live stock and merchandise lying along both sides of the track; that while he was in the discharge of his duty as assistant train master in the night time and crossing the track through said pass- ageway to attend to the live stock on the opposite side of the track, and exercising all due care for his own safety, defendants' servants negligently caused an engine to run against the end of one of said cars with such force that thereby the passageway was closed and Otto was caught and killed; that defendants well knew that Otto was using said passageway at that time, and that it was their duty not to close it while he was using it without giving him warning by ringing the bell or sounding the whistle or warning him of the intention to close the passageway; and that no bell was rung or whistle sounded or warning given Otto of the danger to be caused by the closing of the passageway. A demurrer was sustained to the second count. The

third count and an additional count were similar to the first count, except that they did not charge that defendants had left said passageway for the use of Otto. Defendants filed the general issue and a special plea. The latter alleged that Otto was not at and before the time of the accident in the performance of any duty or service for defendants and was not then in the employ of defendants as assistant trainmaster; that the opening between the cars where Otto was injured was not left by defendants for the passage of Otto back and forth across the track; and that Otto was upon the right of way and track while attempting to pass through said opening, without any right or authority from said defendants and not in obedience to any order or duty enjoined upon him by the defendants. Issue was joined on these pleas. Afterwards the first, third and additional counts were amended by striking out the words ''for the purpose of attending to said merchandise and live stock on the opposite side of said track,'' and equivalent words wherever they occurred in said counts. Plaintiff had a verdict and a judgment and defendants appealed.

This was a stock train bound east. It was wrecked very early in the morning of January 9. Otto was sleeping at a hotel in Byron, a few miles southeast. By direction of the station agent at Byron, Otto was called at 2:30 or 3 o'clock that morning to go to the wreck, and he went. Palmer, the trainmaster, came later. A wrecking train and crew came from the west. There was a locomotive engine and a train crew made up of engineer, fireman, conductor and two brakemen. They had ahead of the engine to the southeast a steam derrick, an idler or car over which the crane hung when not in use, some truck cars loaded with working appliances and a caboose, and a wrecking crew composed of a wrecking foreman, steam derrick engineer and five helpers. The wreck was on the main track and next to it was a passing track. Both tracks were blocked by the wreck. It was decided that the passing

track could be more quickly cleared for traffic than the main track, and this was done. The steam derrick was brought into action, some cars were lifted out of the way, others were straightened and set upon the track. There were a number of carloads of hogs, out of the cars and on the right of way. Most of the uninjured hogs were placed in cars, and several carloads of them were taken to Byron and there unloaded and fed. Quite a number of hogs were on the ground on either side of the track, dead or injured. Early in the afternoon, after the passing track had been cleared for travel, the officers and the crew of the wrecking train went to Byron for dinner. The train returned to the wreck a little after five o'clock P. M. Palmer, who was Otto's superior, told him that there was no need for them to return to the wreck, as there was nothing for them to do. Otto said he would ride back, and he did so. About seven o'clock in the evening there were seven cars in line along the main track. A part of the wheels, at least, were on the ground, which was frozen hard. After Otto returned to the wreck, several farmers from the neighboring country came to the wreck, and Otto proceeded to negotiate with them for the sale of dead and injured hogs on each side of the track. He sold a number to one Rafferty and collected pay therefor, and Rafferty considered that he had bought all that were dead or injured. In fact, the sale of merchandise at a wreck was not within the duty or authority of either the trainmaster, or the assistant trainmaster, but of Wheaton, the freight claim agent, and no one had directed or authorized Otto to do this, and Palmer had refused to make any contract concerning the dead hogs, but had announced that the freight claim agent would be there that night or the next morning and would have charge of that business, and he did arrive some time after Otto was killed. At seven o'clock that evening the seven cars were in line as already stated. There was a wide space between the wrecking train and the first car east of it and an-

other wide space between the first car and the second car, a space of about three feet between the fifth car and the sixth car, and a space of some eight feet between the sixth car and the seventh car, which was the last car to the east. It was dark, and the only light, other than starlight, was caused by such lanterns and torches as the men carried. The wreck foreman had told Otto, while they were coming back from Byron, that he was going to couple up the remaining cars. A little after seven o'clock the wreck foreman was near the east end of the string of cars, and he told Otto that he was going to couple up, and he gave notice in a voice heard by several men standing near Otto to look out or to get away, that they were going to couple up, and then gave an order to the conductor to couple up, and the conductor gave a signal to the engineer to come ahead to the east. They failed to make a coupling. The conductor, by order of the foreman, caused the movement to be repeated, without effect. The foreman then gave an order to have the engine strike the train hard, and that order was given to the engineer and was obeyed, and the fifth and sixth cars were brought together. Shortly before this another farmer had applied to Otto to buy some of the hogs and Otto said he would have to speak to another buyer first, meaning, as is supposed, Rafferty. When the order to couple up was given, Otto was on the bank some 25 feet south of the train. None of the men in charge of the train knew that he had passed through that opening between the fifth and sixth cars, but he and some of the farmers had, in fact, passed through there. At the instant when the order was given to strike hard, one of the section men saw Otto go in the direction of this opening between the fifth and sixth cars. No one else saw him at all at that time. He got between them just in time to be caught as the cars came together. That this was a proper way to effect a coupling was shown by the fact that after Otto had

been released and taken away, a fourth and harder attempt was made and the coupling was accomplished. There was proof that, when one of the men hurried to the engine and told the engineer that he had pinched a man, the engineer said: "What kind of damn signals are you giving me? I went according to the signals, and if they were wrong I can't help it," or words to that effect. There was other proof that the engineer made no such statement. If he said so, it did not prove that the signals were wrong. There was proof by several witnesses of things said by Otto before he was released from his place between the cars and afterwards while he was being taken on a train to Byron, which indicated that Otto considered that he had been negligent in undertaking to pass between those cars at that time. The passageway was very narrow and apparently had been made considerably less than three feet by the first and second efforts to make the coupling, which was before he undertook to pass through. There was a wide space at the rear of that sixth car, and he could have passed around the seventh car without any obstruction. There was no allegation or proof that there was any highway east thereof which made it necessary to give the statutory signals. No bell was rung or whistle sounded when these efforts were made to couple the cars, but the proof was that, in working at a wreck, it was customary not to ring a bell because it created confusion and made it difficult to hear the orders and signals when given by word of mouth. Otto was a man of capacity and intelligence and an experienced man. He had been telegraph operator, station agent, chief train dispatcher and assistant train master, and was thirty-four years of age.

The allegation that this passageway had been opened for Otto's use was not supported by any proof. The cars stood as they happened to be placed after they had been straightened into line by the use of a derrick. Defendants and their servants owed the duty to Otto not to wilfully injure him, but there is no pretense that

that duty was violated. None of the men in charge of any part of the work knew that he had passed through there at all. The farmers knew it, and one section man at the last instant saw him start in that direction. We are unable to see that the defendants and their servants violated any duty which they owed to Otto. He had been given warning just before the accident that the cars were going to be coupled together. That was said to him specially. The announcement was then made in a loud voice to look out, to get away, that a coupling was to be made. It was heard by men who stood near him and it must have been heard by Otto. He was an experienced railroad man. In our opinion this unfortunate accident was entirely due to the carelessness and negligence of Otto in attempting to pass through this narrow opening at that critical moment. He did not need to go through at all. He could have gone through the next opening which was wide. He could have gone one car length further and been entirely safe. In a moment of carelessness or thoughtlessness or recklessness he voluntarily stepped into a death trap and lost his life. We are of opinion that his administrator has no cause of action against the defendant. This conclusion makes it unnecessary for us to consider many of the difficult questions presented by the record.

The judgment is therefore reversed.

*Reversed.*

Finding of facts to be incorporated in the judgment. We find from the evidence that defendants were not guilty of the negligence charged in the declaration, and that plaintiff's intestate lost his life because of his own lack of due care for his personal safety.